IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22-03071-01-CR-S-MDH |
| | ) | |
| MICHAEL HUNT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT & RECOMMENDATIONS**

Before the Court is Defendant's Motion to Suppress Evidence. (Doc. 69.) This action has been referred to the undersigned for the purpose of submitting a report on any pretrial motions to suppress evidence. As follows, it is **RECOMMENDED** that the Motion to Suppress Evidence be **DENIED**.

### I. Background

Defendant has been charged by indictment with possession with intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). (Doc. 30.)

In his Motion, Defendant asks the Court to suppress "all evidence gained as a result of the unconstitutional stop and all subsequently obtained evidence." (Doc. 69 at 11.) In support, Defendant claims that "[t]he traffic stop of the Defendant was pretextual, that the Search Warrant lacked specificity and was executed without jurisdiction, in violation of the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at 1.

The Government filed suggestions in opposition to the Motion. (Doc. 74.) A suppression hearing was held on October 21, 2023. (Doc. 82.) Defendant appeared in person

with his attorney, Austin Knoblock, and the Government was represented by Assistant United States Attorney Cameron Beaver. *Id*. U.S. Drug Enforcement Administration (DEA) Task Force Officer (TFO) Stephen Conner and Laclede County Sheriff's Office Sergeant Jake Allen appeared and testified. *Id*. On January 8, 2024, the Undersigned held a status conference, at which time the Court asked the parties to file supplemental briefing on the issue of whether the search warrant was properly issued in Greene County, Missouri. (Doc. 91.) The Government filed supplemental suggestions in opposition and Defendant filed supplemental suggestions in support of the Motion. (Docs. 94, 96.) The Government also filed a second supplemental suggestions in opposition. (Doc. 102.)

## II.     Findings of Fact

On June 9, 2022, TFO Conner applied for a position location information search warrant, directed to Verizon, for the target number 573-303-6984.[1] The application requested the following information: subscriber and billing information, phone and messaging records, stored communication, the global positioning system (GPS) location, the cell site location information, triangulation, and the disclosure of location-based data from June 9, 2022, through June 18, 2022. (Doc. 81, Exh. 2, Affidavit at 1.) TFO Conner provided an Affidavit in support, wherein he stated:

> I, Stephen Conner have been an Ozark Police officer for over 8 years, and am currently assigned to that agency's Criminal Investigation Division loaned to Drug Enforcement Administration (DEA). I have received numerous hours of documented law enforcement training, including specific training in the area of

---

[1] On May 3, 2022, TFO Conner applied for a position location information search warrant, directed to Verizon, for the target number 573-530-8180. As best as the Court can construe, Defendant only briefly references the first search warrant to the extent to note it's similarity to the second search warrant. (Doc. 69 at 2; Doc 82 at 73 –74.) The Court notes that the second affidavit alleges all the same facts of the first, with two additional paragraphs of facts added and a different target telephone number. The undersigned will proceed to analyze the second search warrant as Defendant's argument centers around the June 9, 2022, warrant.

narcotics enforcement, along with numerous hours of other specialized law enforcement training. I have received this specialized training from the Ozark Police Department, the Combined Ozarks Multijurisdictional Enforcement Team (COMET), DEA, and other numerous law enforcement entities. I have attended schools and seminars related to the field of crime scene investigation and the investigation of the crime(s) of Chapter 579, RSMo. I have received specialized training into the recognition of controlled substances, and the detection/interdiction/manufacturing of such controlled substances. I have conducted several investigations and assisted in the issuance and execution of search warrants related to those crimes and I have arrested suspects because of those investigations. I have participated in the planning and execution of several search warrants. Upon information and belief based upon the following, I believed the above described items will be found at the above described location to be searched.

Upon information and belief, the Verizon brand cellular telephone bearing number (573) 303-6984 (hereinafter the "Target Telephone") which is being utilized by Brandon WHITEHEAD (DOB 11-24-1978) is presently being used in connection with the commission of ongoing drug distribution and drug trafficking, by WHITEHEAD and others, known and unknown, in Greene County, Missouri.

I submit this Affidavit in support of the attached application for an order authorizing the tracking of the Target Telephone, to include GPS location, cell-site location information, triangulation, and the disclosure of location-based data. I set forth the following facts showing that there are sufficient grounds to believe that the GPS location, cell-site and other subscriber records, and information pertaining to the Target Telephone will likely be relevant and material to an ongoing criminal investigation.

The information contained in this affidavit is based on my personal knowledge and investigation, Confidential Source CS debriefings surveillance as well as information provided to me by other law enforcement agents involved in the investigation of this case. This affidavit contains the facts necessary to establish probable cause to track the Target Telephone. Not all of the facts known to me about this investigation have been included.

In late February 2022, Task Force Officer (TFO) Stephen Conner met with a DEA Confidential Source, specifically CS-21-164727, hereafter referred to as CS, at an undisclosed location in Ozark, Missouri. During the meeting with the CS, they provided TFO Conner with information in regards to Brandon WHITEHEAD (aka T aka Too Much) distributing heroin/fentanyl. The CS further advised TFO Conner that WHITEHEAD was using several phone numbers and would transport large quantities of heroin/fentanyl from Columbia, Missouri to Springfield, Missouri on a bi-weekly basis. The CS must remain confidential to protect his/her safety and ongoing investigations. The CS is familiar with heroin due to past use and association with the drug culture. This particular CS has been proven reliable and has provided information that I have confirmed as reliable from follow-up investigations and surveillance.

On April 8, 2022, at approximately 8:00 a.m. TFO Nick Mittag interviewed a source of information (SOI) at an undisclosed location in Springfield, Missouri. During the interview the SOI told TFO Mittag that a male they knew as "T" was supplying a male named "Ryan" with $5,000.00 to $10,000.00 worth of heroin each week. The SOI further advised "T" was supplying a female friend named "Heather" with heroin for $2,000.00 an ounce. The SOI provided TFO Mittag with two phone numbers for "T." These phone numbers matched two previous phone numbers TFO Conner's CS provided for WHITEHEAD.

On April 29, 2022, TFO Conners met with the CS at an undisclosed location, at which time the CS contacted WHITEHEAD to arrange a purchase of heroin/fentanyl. WHITEHEAD responded to the CS and agreed to sell them $400.00 worth of heroin/fentanyl and agreed to meet the CS at 4:00 p.m., at the Price Cutter located at 3260 E. Battlefield Road, Springfield, Missouri.

At approximately 4:00 p.m., the CS arrived at Price Cutter. At approximately 4:05 p.m., the CS contacted WHITEHEAD on the Target Phone to see where he was. WHITEHEAD advised he was at hotel, but would be there in fifteen (15) minutes. During the conversation, WHITEHEAD further confirmed the CS was purchasing $400.00 worth of heroin/fentanyl and confirmed the CS wanted "it all" in one package. At approximately 4:40 p.m., WHITEHEAD was observed arriving at Price Cutter in a grey Toyota Camry bearing Florida registration LDR-B97; registered to Hertz Rentals. WHITEHEAD contacted the CS in person, and immediately requested they change locations. At approximately 4:50 p.m., the CS drove into the parking lot of the Days Inn located at 3260 E. Montclair Street, Springfield, Missouri and parked next to WHITEHEAD's vehicle at the south end of the parking lot. TFO Conner witnessed the CS exited [sic] their vehicle and entered the front passenger seat of WHITEHEAD's vehicle. After a couple of minutes, the CS exited WHITEHEAD's vehicle returned to their vehicle, and exited the parking lot. After a couple minutes, the CS exited WHITEHEAD's vehicle, returned to their vehicle, and exited the parking lot.

After the CS left the parking lot, TFO Conner and TFO Estes followed the CS to a predetermined location. Upon meeting the CS, TFO Conner collected a plastic bag containing a white powdery substance suspected to be fentanyl that was purchased by the CS. A field test was conducted on the white powdery substance and a positive indication for fentanyl was obtained.

On Saturday May 28, 2022, the CS contacted TFO Conner and advised WHITEHEAD was in Springfield; staying at the Oasis Hotel and Convention Center located at 2546 N. Glenstone Avenue. On June 4, 2022, the CS contacted TFO Conner and again advised WHITEHEAD was staying at the Oasis Hotel and Convention Center.

On June 9, 2022, TFO Conner was contacted by TFO Joshua Tucker in regards to information regarding WHITEHEAD. TFO Tucker advised Springfield Detective Austin Faulconer had a reliable SOI who identified a male named "T" as a subject who comes to Springfield, Missouri from Columbia, Missouri to sell fentanyl. The SOI further advised Detective Faulconer of several subjects associated with "T." TFO Conner recognized these names as being local associates of WHITEHEAD; leading TFO Conner to believe the "T" subject is

> WHITEHEAD. The SOI further advised they previously purchased ounces of fentanyl from WHITEHEAD on multiple occasions and advised the last couple of times, they met WHITEHEAD at the Oasis Hotel and Convention Center. Detective Faulconer provided TFO Conner with a recorded phone conversation made to WHITEHEAD at the target phone from the SOI. Faulconer confirmed that the phone number associated with WHITEHEAD was (573) 303-6984. During the phone call made in front of Detective Faulconer, the SOI advised WHITEHEAD they wanted to purchase six (6) to seven (7) ounces of fentanyl. When told this, WHITEHEAD told the SOI he would be in town Friday (June 10) with approximately twenty (20) ounces of fentanyl and would be at the Oasis Hotel and Convention Center around 4 p.m.

(Doc. 81, Exh. 2, Affidavit at 2–4.) The affidavit and application for target telephone number were reviewed and signed by Greene County, Missouri, Assistant Prosecuting Attorney Nicholas Bergeon. (Doc. 81, Exh. 2, Affidavit at 5.) On June 9, 2022, Greene County, Missouri, Associate Circuit Judge Margaret Palmietto verified the application and affidavit and issued the search warrant to Verizon for position location information for 573-303-698. (Doc. 81, Exh. 2, Affidavit at 5; Search Warrant at 1–2.)

On June 10, 2022, TFO Conner contacted Jefferson City, Missouri, Post of Duty (POD), requesting assistance to locate the target telephone number ending in 6984 [hereinafter "target number"]. (Doc. 82 at 22–23.) Members of the Jefferson City POD established surveillance based on the position location information from the target number and observed a male matching "T's" description entering a dark black Jeep Renegade with California license plate 8XMP053. *Id.* at 22–23, 47. Based upon the position location information from the target number coinciding with the location of the vehicle at multiple different locations, the black Jeep Renegade was identified as being operated by "T." *Id.* at 23.

On June 12, 2022, TFO Conner was contacted by Detective Faulconer who told him he had received information from his SOI that "T" was coming to Springfield, Missouri, with fentanyl that day. *Id.* On June 12, 2022, later in the day, TFO Conner received updated position location information from the target number that "T" was traveling southbound on Highway 63

5

and was located between Columbia, Missouri, and Jefferson City, Missouri. *Id.* at 24. Based on this information, TFO Conner believed "T" was traveling to Springfield, Missouri, and requested law enforcement to set up along the route believed to be taken by "T." *Id.* TFO Conner also contacted Sergeant Allen with the Laclede County, Missouri, Sheriff's Office to set up a position on Highway 5 north of Lebanon and conduct a traffic stop, should he establish probable cause to do so. *Id.* at 25. TFO Conner observed the position location information for target telephone number indicate that "T" was entering Laclede County, Missouri, and traveling southbound on Highway 5. *Id.* at 25–26.

At approximately 2:20 p.m., Sergeant Allen observed the black Jeep Renegade with California plate 8XMP053, traveling Southbound on Highway 5. *Id.* at 26, 47. While following the Jeep Renegade, Sergeant Allen used the speed measuring technique of pacing to measure the vehicle's speed at 72 miles per hour in a 65 miles per hour zone, in violation of Missouri state law. *Id.* at 48–50. The vehicle continued this speed before slowing down to around 60 miles per hour. *Id.* at 51. Sergeant Allen then activated his emergency lights and conducted a traffic stop based upon the Jeep Renegade driving over the posted speed limit. *Id.* After stopping the vehicle, Sergeant Allen contacted the driver, later identified as Defendant and informed him of the reason for the stop. *Id.* at 53. Sergeant Allen observed that Hunt appeared agitated and was defensive of his speed but admitted to travelling 70 miles per hour. *Id.* at 53–54. While speaking with Defendant, Sergeant Allen noticed the smell of cultivated marijuana coming from within the vehicle and a black duffel bag in the front passenger's seat. *Id.* at 54.

Sergeant Allen asked Hunt to exit his vehicle and accompany him to Sergeant Allen's vehicle so that he could complete the computer checks while maintain officer safety. *Id.* at 54. As Defendant exited his vehicle, he locked the doors. *Id.* at 61. Once inside Sergeant Allen's

vehicle, Sergeant Allen checked Defendant's identifiers through databases MULES and NCIC. *Id.* at 56. Sergeant Allen found that Defendant was a valid Missouri driver with no warrants and the license plate was registered out of California to a rental company. *Id.* at 55–56. After learning the vehicle was owned by a rental company, Sergeant Allen asked Hunt if he was on the rental agreement, to which Hunt responded that he was. *Id.* at 56.

Sergeant Allen also asked Defendant if he possessed a valid medical marijuana card, and Defendant said he did and provided a paper copy, which was confirmed through MULES and NCIC. *Id.* at 55–56. Sergeant Allen asked Defendant if he would give consent to search his vehicle, and Defendant appeared to get agitated before denying Sergeant Allen's request. *Id.* at 56. Sergeant Allen asked Missouri State Highway Patrol Trooper Harrison, another officer present at the scene, to issue Hunt a summons for speeding while Sergeant Allen deployed his Police Service Dog (PSD) Jude to conduct a non-intrusive exterior sniff of the Jeep Renegade.[2] *Id.* at 57. PSD Jude is certified yearly through the North American Police Work Dog Association and the Missouri Police Canine Association. *Id.* at 58. During this sniff, PSD Jude gave a positive alert on the front passenger door seam of the vehicle. *Id.* at 60. After PSD Jude's positive alert, Sergeant Allen advised Hunt that he had probable cause to search the vehicle, at which time Defendant refused to unlock the vehicle or give Sergeant Allen the keys. *Id.* at 61. During this time, Defendant was sweating profusely and began complaining of a panic attack and Sergeant Allen requested an ambulance respond to the location. *Id.* at 62. Sergeant Allen also called a local tow company to unlock the vehicle. *Id.*

---

[2] PSD Jude is not trained to detect the order of marijuana and is trained to detect methamphetamine, heroin, cocaine, and all base odors and derivatives associated with these substances. (Doc. 82 at 59.)

The tow truck company arrived on scene and unlocked the vehicle, allowing Sergeant Allen to conduct a search of the vehicle. *Id.* During the search, Sergeant Allen located a duffle bag in the front passenger seat, the area that PSD Jude had alerted. *Id.* at 63. Sergeant Allen opened the duffle bag and found plastic bags that contained a large quantity of a white powdery substance that field tested positive for fentanyl. *Id.* After Defendant was taken to the hospital and cleared, Sergeant Allen transported Defendant to Greene County Jail, turning over custody of Defendant to DEA Task Force Officers Estes and Conner. *Id.* at 64.

### III. Conclusions of Law

#### A. The Search Warrant Was Properly Issued in Greene County, Missouri

Defendant argues that the search warrant was executed without jurisdiction because the warrant was executed in Boone County under the authority of a search warrant which was signed in Greene County. Missouri criminal procedure dictates that when a criminal offense occurs in a county, a circuit judge has original jurisdiction in that county. Mo. Rev. Stat. § 478.070. It is undisputed that the crimes in this case were committed in Greene County. Furthermore, Missouri courts can issue interstate warrants seeking records from an out-of-state company providing "electronic communication services," as provided by statute:

> The provisions of this section shall apply to any subpoena or search warrant issued to search for records that are in the actual or constructive possession of a foreign corporation that provides electronic communication services or remote computing services to the general public, where those records would reveal the identity of the customers using the service, data stored by, or on behalf of, the customer, the customer's usage of those services, the recipient or destination of communications sent to or from those customers, or the content of those communications.

Mo. Rev. Stat. § 351.609.2. A "foreign corporation" is defined under Missouri law to be "a corporation for profit organized under laws other than the laws of this state." Mo. Rev. Stat. § 351.015(7); Mo. Rev. Stat. § 351.609.1(3). "Electronic communication services" and "remote

computing services" are defined by the federal Electronic Communications Privacy Act, 18 U.S.C. § 2701 et seq. *See* Mo. Rev. Stat. § 351.609.1(3). "Electronic communications service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications," 18 U.S.C. §§ 2510(15), 2711(1), and "remote computing service" means "the provision to the public of computer storage or processing services by means of an electronic communications system," § 2711(2).

The undersigned finds that Mo. Rev. Stat. § 351.609 explicitly authorized Judge Palmietto to issue the search warrant. The search warrant was directed to Verizon and Verizon is a "foreign corporation" for the purposes of § 351.609: Verizon Communications Inc. ("Verizon") is incorporated in Delaware and the warrant was directed to an address in New Jersey. The undersigned finds that Verizon provides "electronic communications services," as defined by the statute, as it offers "offer[s] data, video and voice services and solutions on our networks and platforms that are designed to meet customers' demand for mobility, reliable network connectivity and security." *See* Verizon Communications Inc., Annual Report (Form 10-K) (Feb. 9, 2024).

Furthermore, the location service data requested, including the cell site location and Global Positioning System (GPS) information, would provide information about the location of the customer or subscriber's phone, which constitutes records showing "the customer's usage of those services" and the "destination of communications sent to or from those customers." As such, the undersigned finds that Judge Palmietto of Greene County had authority under Missouri law to issue the search warrant, regardless of the cell phone's physical location. Accordingly, any evidence, derived as a result of the search warrant need not be suppressed as fruits of the poisonous tree.

## B. The Search Warrant Met the Particularity Requirement

Defendant argues that the search warrant does not meet the particularity requirement, rendering it invalid, because the affidavit did not particularize Defendant's name or date of birth. "The Fourth Amendment mandates that no Warrants [sic] shall issue . . . [unless] particularly describing the place to be searched, and the persons or things to be seized" to prevent "officers from conducting general, exploratory rummaging of a person's belongings." *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir. 2023) (quoting U.S. Const. Amend. IV) (cleaned up).

"To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007). "The Fourth Amendment requires particularity in the warrant, not supporting documents like an application or affidavit." *United States v. Sigillito*, 759 F.3d 913, 923–24 (8th Cir. 2014). "Whether a warrant fails the particularity requirement cannot be decided in a vacuum, and [courts] must consider the total circumstances surrounding the case." *Shrum*, 59 F.4th at 973 (cleaned up). "The particularity requirement is one of practical accuracy rather than of hypertechnicality." *Id.*; *see also United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979) (upholding a warrant "where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place to be searched with particularity").

"With respect to the cell site location information obtained from GPS phone tracking, there must be a fair probability that evidence of suspected narcotics dealing would be found in data generated by the tracking of the cellular phone at issue." *See United States v. Atayde-Ortiz*, No. 21-CR-158 (MJD/ECW), 2022 WL 3566997, at *2 (D. Minn. June 16, 2022). Nowhere does the warrant authorize the search of a specific person. As the Government points out, the

accompanying affidavit actually states that the geographical location of the target telephone number was needed to verify the user's identification and location. (Doc. 81, Exh. 2, Affidavit at 4.) Furthermore, the Eighth Circuit has recognized cellphones as tools of the drug trade. *See United States v. Eggerson*, 999 F.3d 1121, 1125 (8th Cir. 2021) ("If firearms are 'tool[s] of the [drug] trade,' as we have often said, there is little reason to believe that cell phones are not."). The search warrant in this case authorized the cellular tower location, service information, and GPS location information specifically related to the target telephone number. Accordingly, the undersigned finds that Defendant's argument misstates the warrant's authorization, and as such that the warrant sufficiently meets the particularity requirement to satisfy the Fourth Amendment.

### C. The Traffic Stop and Vehicle Search was Supported by Probable Cause

"Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Rederick*, 65 F.4th 961, 965 (8th Cir. 2023) (cleaned up). The Eighth Circuit has "established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (cleaned up). "The determinative question is not whether a traffic violation had actually occurred, but whether an objectively reasonable police officer could have formed a reasonable suspicion that the driver was committing a code violation." *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (cleaned up).

The undersigned finds that the traffic stop by Sergeant Allen was supported by probable cause. Defendant has failed to come forward with any evidence showing that Sergeant Allen was not credible in his testimony, or that use of the pacing technique was not a valid way to

determine the speed Defendant's vehicle was traveling.[3]  *See United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015) (finding that the traffic stop of defendant's motorcycle was supported by probable cause where an officer stopped the defendant because he believed the defendant had committed a traffic violation by driving at least ten miles per hour over the speed limit after he used "pacing" to estimate the defendant's speed).  The undersigned finds Sergeant Allen's testimony to be credible.  *See United States v. Stewart*, 32 F.4th 691, 694 (8th Cir. 2022) ("Credibility assessments are 'the province of the trial court.'").  As such, the traffic violation observed by Sergeant Allen established probable cause for him to conduct a lawful traffic stop of Defendant's vehicle.

Additionally, the traffic stop was not unlawfully pretextual.  An officer's "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).  The Eighth Circuit has established that "[o]nce an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant."  *Gunnell*, 775 F.3d at 1083 (finding that even if the officer's primary intent was to stop the defendant in order to further a drug investigation, the traffic violation provided probable cause to support the stop).  "Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive."  *Id.*  As such, the undersigned concludes that the traffic stop was supported by probable cause and was not unlawfully pretextual.

Defendant argues that the subsequent search of the vehicle was tainted because the stop was unconstitutional and therefore any evidence seized from the search must be suppressed as being fruits of the poisonous tree.  However, as already stated above, the undersigned already

---

[3] Defendant also admitted to Sergeant Allen that he was traveling 70 mph, in excess of the posted 65 mph speed limit.  (Doc. 82 at 54.)

found that the initial stop itself was constitutional. Further, law enforcement may seize and search a vehicle, without a warrant, when they develop probable cause to believe it contains contraband or evidence of criminal activity. *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021). While Trooper Harrison issued Defendant a summons for speeding, Sergeant Allen deployed his PSD Jude for an external open-air sniff, at which time PSD Jude alerted on Defendant's passenger side door.[4]

The undersigned finds that the officers had probable cause to search Defendant's vehicle. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *See United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007). PSD Jude is certified through the North American Police Work Dog Association and the Missouri Police Canine Association to detect methamphetamine, cocaine, heroin, and all their base odors and derivatives. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). Defendant does not challenge the reliability of PSD Jude's alert or that the officers had probable cause to believe his vehicle contained drugs after the alert. The undersigned concludes PSD Jude's alert was reliable, and as such the officers had probable cause to search Defendant's vehicle.

---

[4] Although Defendant does not argue that the stop was unreasonably prolonged, the undersigned notes that the traffic stop did not constitute an unreasonably prolonged detention. "To establish an unreasonably prolonged detention, the defendant must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *Donnelly*, 475 F.3d at 951–52. The undersigned finds that Defendant was not detained unreasonably long. Trooper Harrison wrote the ticket as Sergeant employed PSD Jude. After PSD Jude alerted on the vehicle, Sergeant Allen had probable cause to extend the traffic stop.

Accordingly, any evidence, derived as a result of the traffic stop as well as the subsequent search of Defendant's vehicle, including any property seized, statements obtained, and observations made, need not be suppressed as fruits of the poisonous tree.

D. **Conclusion**

For the foregoing reasons, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress Evidence be **DENIED**.

**IT IS SO ORDERED.**

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: March 8, 2024